1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    Tiffany Goodson,                              No. 2:18-cv-03105-KJM-DB

12                       Plaintiff,                 FINDINGS OF FACT AND
                                                    CONCLUSIONS OF LAW
13           v.

14    County of Plumas, et al.,

15                       Defendants.

16

17           Tiffany Goodson, who used the last name Wagner at the time, worked as a correctional

18    officer in Plumas County, California.  In the summer of 2018, she reported that a supervising

19    sergeant, Brandon Compton, had sexually harassed her.  Compton resigned, but within two

20    weeks, the County put Goodson on administrative leave.  It began an investigation that

21    culminated in her termination.  In this lawsuit, Goodson pursues harassment and retaliation claims

22    against the County and Compton.  The case was tried without a jury in August 2022.

23           As set forth below in the court's findings of fact and conclusions of law, Goodson proved

24    at trial that both her former supervisor and the County are liable for creating a hostile work

25    environment in violation of the California Fair Employment and Housing Act.  She also proved

26    the County is liable for terminating her employment based in part on a retaliatory motive, again in

27    violation of the Fair Employment and Housing Act.  She is entitled to compensatory damages of

28    $752,214 as well as equitable relief.

## I.    THE COURT'S ROLE AND DUTIES

In cases tried without a jury, the Federal Rules require the trial court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). If the court does not state its findings and conclusions on the record at the close of evidence, it must prepare "an opinion or a memorandum of decision." *Id.* The court's findings must be "explicit enough" to offer "a clear understanding" of its decision. *Colchester v. Lazaro*, 16 F.4th 712, 727 (9th Cir. 2021) (quoting *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002)).

District courts often present their factual findings in numbered lists, but Rule 52 does not require that format. Numbered factual findings can be "cumbersome" or even counterproductive, especially when the court must answer mixed questions of law and fact. *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920, at *1 n.1 (E.D. Wis. July 3, 2012), *aff'd*, 768 F.3d 682 (7th Cir. 2014). After reviewing the record and evidence presented at trial, the court has determined that a narrative presentation, supported by citations when necessary, will explain its findings and conclusions most clearly.

## II.    FINDINGS OF FACT

Goodson began working at the Plumas County Sheriff's Department in 2011. Joint Ex. 8 at 21. After a few months, she finished her training and started as a correctional officer in the local jail. *Id.* at 20. Working in the jail brought her pride and satisfaction. Trial Tr. 47. She planned to build a career in law enforcement. Trial Tr. 47, 55. The job gave her a feeling she was part of something bigger than herself. Trial Tr. 47. She helped start a self-improvement program for the jail's inmates, which her coworkers lightheartedly dubbed the "hug-a-thug" program. Trial Tr. 53, 123. She felt like she was helping inmates improve themselves. Trial Tr. 47–48, 53.

Goodson worked the graveyard shift. Tr. 55–56. This meant her workday typically started at 10:00 p.m. and ended at 8:00 a.m. the next morning. Trial Tr. 57–58. Only two other officers would be at the jail when she arrived at the beginning of a typical shift: one sergeant and one other correctional officer. *Id.* The sergeant's shift ended at midnight, leaving Goodson and

the other officer alone in the facility until officers on the daytime shift arrived at 6:00 a.m. *Id.* In 2018, she was the officer in charge overnight when no sergeant was on duty. Trial Tr. 58.

Goodson's supervisors praised her work. Trial Tr. 48. She regularly met or exceeded their expectations for an officer in her position. *See* Joint Ex. 8 at 1–2, 5–6, 8, 10–16, 19–20. The jail commander praised her for going "above and beyond," Trial Tr. 53; Joint Ex. 8 at 2, and she was assigned to train new officers, Trial Tr. 170. The County even offered her a promotion to sergeant, but she declined; the promotion would have come with a change in shifts, and the childcare arrangement she had with her parents depended on her working the graveyard shift. Trial Tr. 55–56.

Goodson also got along well with her coworkers. She felt like they were her family, and she thought of the jail as her home away from home. Trial Tr. 79, 155, 165, 169. She often greeted coworkers with an affectionate hug or kiss. Trial Tr. 162, 164, 299. They laughed and cried together, and she confided in them about problems in her personal life, including her marriage, her finances and her intimate relationships. *See, e.g.*, Trial Tr. 167–68, 299, 679. Her coworkers helped her when money was tight. Trial Tr. 168–69.

The officers in the jail also teased one another and joked in an attempt to alleviate the jail's sometimes oppressive atmosphere. Unfortunately, their attempts at fostering an *esprit de corps* often devolved into juvenile, crude and even violent interactions. In one "game," an officer would form a circle with a thumb and index finger and hold the circle against his or her lower body. Trial Tr. 595. That officer "won" the game by catching another looking at the finger circle. *Id.* If another officer managed to poke the first officer through the circle, the first officer lost. *See id.* The winner's reward? Free rein to punch the loser. *See id.* Officers gave one another "wet willies," i.e., "when you take your finger in your mouth and get it wet with saliva and put it another person's ear." Trial Tr. 582. Officers also slapped one another forcefully on the buttocks, men and women alike. They called these blows "body gloves," because their goal was to strike the other person so hard that the impact left a handprint of irritated flesh in the shape of the Body Glove swimwear brand logo. Trial Tr. 576. Officers, men and women alike,

1  sometimes flicked or hit one another in the chest, breasts and genitals.  *See, e.g.*, Trial Tr. 578–80,

2  584–85, 700.

3      When officers testified at trial about this crude roughhousing, one officer's name came up

4  more than any other: Brandon Compton.  *See, e.g.*, Trial Tr. 178, 579–82, 671–72, 706, 782.

5  Compton, a sergeant at the time, supervised the day shift beginning at 6:00 a.m.  Trial Tr. 58–59.

6  Because Goodson's shift ended at 8:00 a.m., her hours overlapped with Compton's morning

7  hours during which time he was her supervisor.  *See id.*  Compton approved Goodson's schedule

8  changes, assigned her tasks and signed her performance reviews.  *See* Trial Tr. 59; Joint Ex. 8 at

9  1–2; Def. Ex. E at 4.  Despite Compton's inappropriate behavior, Goodson had long considered

10  him a friend.  Trial Tr. 65, 299.  She had attended the jail academy with him many years before,

11  alongside another officer, Sergeant April Gott.  Trial Tr. 161–62.  Goodson often greeted

12  Compton with a friendly hug or kiss, and they, like others in the jail, confided in one another

13  about personal and family problems.  Trial Tr. 299.

14      At trial, the parties devoted a great deal of time and effort to eliciting testimony about

15  whether Goodson hit others in the groin or buttocks.  It is difficult to draw any firm conclusions

16  from these accounts, as many years have passed since Goodson worked in the jail, the officers'

17  memories are inconsistent, and their accounts have changed over time.[1]  What is clear is that

---

[1] The key testimony on this point is summarized below, by witness:

Sergeant Brandon Compton.  Trial Tr. 575–84 (testifying Goodson hit him both in the groin and on the buttocks).

Officer Daniel Perreault.  Trial Tr. 492–94 (detective testifies Perreault told him Goodson slapped Compton's buttocks and hit his groin); Trial Tr. 672, 675 (Perreault testifies Goodson attempted to hit Compton in the groin); Trial Tr. 683 (Perreault testifies he did not see Goodson slap Compton's buttocks); Trial Tr. 699–700 (Perreault testifies he saw Goodson slap Amber Hermann and Cody Henneker on the buttocks); Joint Ex. 9 at 111 (recording Perreault's claim to detectives that Goodson hit Compton in the groin with a closed fist); Joint Ex. 16 at 58–59 (recording Perreault claim to detectives that Goodson did not hit Compton's buttocks but once attempted to strike Compton's groin); Trial Tr. 382 (detective testifies about this report).

Sergeant April Gott.  Trial Tr. 700 (testifying she did not see Goodson hit anyone in the groin); Joint Ex. 9 at 100–01 (recording Gott's statement to investigators that Compton and Goodson slapped one another on the butt); Trial Tr. 368 (testimony by Peay about the same report); Joint Ex. 9 at 96 (reporting Gott's statement to investigators that Goodson and Compton slapped one another on the buttocks); Trial Tr. 492 (Clark testifies about this report); Trial Tr.

1   Goodson was not offended or hurt by the inappropriate games Compton and other officers played

2   in the jail, but she did not participate in many of them. *See, e.g.*, Trial Tr. 177–79.  No one

3   testified, for example, that Goodson gave other officers wet willies or played the circle game.

4   And on balance, the evidence does not show Goodson regularly struck others in the groin, breasts,

5   buttocks or chest, if she ever did so at all.

6       In any event, the flurry of testimony about groping and butt slapping is a red herring.  This

7   case fundamentally is not about the other officers' juvenile and inappropriate misbehavior.

8   Goodson filed no complaints about that behavior.  Her complaints focused on far more serious

9   misconduct, which began in the late Spring of 2018, when her once-friendly relationship with

10  Compton suddenly changed.  As she put it at trial, "he crossed boundaries that should have never

11  been crossed."  Trial Tr. 78.

12      Specifically, on one workday in May, Goodson was talking with Compton and another

13  officer, Lilianna Ah Wah, in the jail's sally port.  Trial Tr. 66–67.  Goodson had recently lost

14  weight and was expressing a newfound sense of freedom.  *Id.*  She said she wanted to swim with

15  sharks and go skydiving, and she asked Compton and Ah Wah if they would ever try something

16  like that.  *Id.*  Both said no.  *Id.*  After Ah Wah left, Compton told Goodson there was one way he

17  might be convinced to join her.  *Id.*  "What was that?" she asked.  *Id.*  "If you got on your knees

18  and gave me a blow job," he told her.  *Id.*

---

714 (Gott testifies Goodson slapped Compton on the buttocks "frequently," "at least once a week" and also slapped Gott on the buttocks).

Sergeant Shawn Adams.  Joint Ex. 16 at 55 (recording Adams's expressing surprise in response to allegations of sexual harassment but confirming rumors of a "game" involving slapping on the butt); Trial Tr. 781–82 (testifying he did not see Goodson play the circle game); Trial Tr. 792 (testifying he never saw Goodson hit Compton in the groin); Trial Tr. 795–96 (testifying he did not see Goodson slap Compton on the buttocks).

Officer Lilianna Ah Wah.  Trial Tr. 896 (testifying Goodson hit her buttocks and hit others in the groin); Trial Tr. 899 (same); Joint Ex. 9 at 101–02 (reporting Ah Wah told investigators Goodson did not strike Compton in the groin).

Sergeant Amber Hermann.  Joint Ex. 9 at 129 (reporting Hermann's statement that Goodson "probably" slapped her on the buttocks); Trial Tr. 494 (Clark testimony about this report).

Officer Manroop Sandhu. Trial Tr. 878–85 (testifying he saw Goodson slap Compton on the buttocks about thirty times, explaining his previous testimony to the contrary was dishonest).

Her reaction must have worried him: he asked if she would report that he had sexually harassed her. *Id.* She said nothing. *Id.* But Compton did not let it go. He pressed her, warning her not to forget what had happened to Andrea Murana. *Id.* To Goodson, the implication of that warning was clear. Murana was a former officer. Rumors suggested the Sheriff's Department had forced her out of her job soon after she reported sexual harassment by a coworker. *See* Trial Tr. at 67–68, 199. Compton denies these claims. *See, e.g.*, Trial Tr. at 572–73, 582, 587–88. As explained below, however, Goodson's accounts of Compton's harassment—both in the sallyport and later—are more credible.

According to Goodson, after the exchange in the sallyport, Compton's behavior grew more brazen and more physical over time. One day he blocked Goodson's way as she was coming out of a storage closet—a place where no cameras were aimed—and he squeezed her breast, then asked again if she would report him. Trial Tr. 68. She said no. *Id.* She wanted to work as a Sheriff's Deputy or join the state highway patrol someday, and she feared that if she made a sexual harassment complaint against another officer, a potential employer would pass her over. *Id.* Compton later caught Goodson in the jail's control room, again with no cameras and no one else around. Trial Tr. 70–71. He restrained her with a wrestling maneuver that locked her arms above her head, and he ground his pelvis into her buttocks. *Id.* Another day, he found her alone in the control room again, put his arm around her neck and squeezed her breast. Trial Tr. 72–73. He told her she was "community property" and he could touch her whenever he wanted. *Id.* He did not release her until she agreed. *Id.* Another day, Compton found Goodson in the break room. Trial Tr. 73. He pretended to see a bug in her hair to lure her closer, then grasped her hair, pulled her head back, and licked and bit her neck. Trial Tr. 73–74. And again he warned her: don't forget what happened to Murana. *Id.*

Goodson tried to avoid Compton, to conceal her distress and to stay in view of the jail's security cameras, but without success. Trial Tr. 200–01. As time passed, the abuse piled on. Compton struck Goodson with a water bottle, kissed her neck, shouted profanities at her, told her she loved him, flicked her breast and slapped the back of her head, all while they were at work in the jail. *See* Trial Tr. 75–77.

6

After one particularly violent slap to the head, Goodson decided enough was enough. Trial Tr. 77.  Despite her fears that reporting Compton would cost her both her job and her future career in law enforcement, she decided she had to say something.  Trial Tr. 78.  On July 20, 2018, her day off, two days after the most recent assault, she contacted the jail commander, Steve Hermann, and said she urgently needed to talk.  Trial Tr. 77, 831.  Hermann was at home.  *See* Trial Tr. 831–32.  Goodson drove over and told Hermann that Compton had sexually assaulted her at work.  Trial Tr. 78, 831–32.  She had prepared handwritten notes about what had happened, which she brought with her.  Trial Tr. 834.

After Goodson met with Hermann, the Sheriff's Office put Compton on administrative leave.  Trial Tr. 833, 835–40.  Hermann called Compton and instructed him not to contact anyone at the jail.  Trial Tr. 624–25.  Despite that instruction, Compton called the jail as soon as he got off the phone with Hermann.  *See* Trial Tr. 625, 721.  He asked for Sergeant Gott—his and Goodson's old friend from the academy—and he told Gott he had been placed on administrative leave.  Trial Tr. 721.  He asked if she knew what was going on.  *Id.* Gott told him she had no idea. *Id.*

The Sheriff's Department assigned Detective Sergeant Steve Peay to investigate Goodson's allegations.  He treated the matter as a criminal investigation, not as a workplace complaint of sexual harassment.  *See* Trial Tr. 348–49; *see also* Joint Ex. 16 (investigation report).  This meant his focus was not whether Compton had violated workplace rules or department policies, but rather whether there was probable cause and evidence to support a prosecution of Compton under California criminal law.  *See* Trial Tr. 387–88.  One likely charge he considered would rest on section 243.4 of the state's Penal Code.  A conviction under that section would require proof that Compton had acted "for the specific purpose of sexual arousal, sexual gratification, or sexual abuse." *See, e.g.*, Cal. Penal Code § 243.4(a); *see also* Joint Ex. 16 at 2 (citing section 243.4).  For that reason, Peay investigated Compton's intentions by trying to ascertain if they were sexual through interviews of both Goodson as the reporting victim and other officers who worked with her and Compton.

7

Peay interviewed Goodson the day after she spoke to Hermann.  *See* Trial Tr. 351; Joint Ex. 16 at 11–15.  She was emotional.  Trial Tr. 350.  She brought her notes again, which Peay thought was unusual.  Trial Tr. 396.  In his experience, which he said included thousands of prior criminal investigations and almost one thousand sexual assault cases, sexual assault victims did not keep notes.  Trial Tr. 389, 396.  In any event, Peay believed Goodson's emotions were sincere, and he took her account as truthful, as he ordinarily does when interviewing the victim of an alleged sexual assault.  Trial Tr. 350–51.

After Peay's interview with Goodson, Peay and another detective spoke to Compton. Trial Tr. 351; Joint Ex. 16 at 23–25.  For the most part, Compton denied Goodson's allegations and professed ignorance about "what has been going on."  Joint Ex. 16 at 23.  Compton said several times he did not see Goodson "in that way."  *Id.* at 24.  He admitted to restraining Goodson using a wrestling maneuver, which he described as a "control hold," but he claimed all of the officers did the same thing to one another; they were just practicing the techniques they might need to use in subduing belligerent inmates.  *Id.* at 23.  He also admitted to kissing Goodson's neck after a water bottle struck her, but he denied it was sexual.  *Id.* at 23–24.  He also claimed Goodson had been "acting really weird lately," and he suspected it was because he had recently criticized her for running a "shit show" during her late-night shift.  *Id.* at 23.

Later the same day, however, Compton called Detective Peay and said he wanted to talk again.  *Id.* at 16.  He met Peay in a parking lot, where he gradually admitted to more.  Yes, he had slapped Goodson's buttocks.  *Id.*  Yes, he had "flicked" her breast.  *Id.* at 17.  Yes, his control holds might have seemed sexual.  *Id.* at 17.  And eventually, after Peay suggested falsely there was evidence corroborating a specific claim of sexual assault, Compton admitted to cornering Goodson in a storage closet and grabbing her breasts.  *Id.* at 18.  Compton dismissed it as good fun—playful retaliation because Goodson had "nut checked" him.  *Id.*  As Peay wrote in his report, "Compton tried to explain that he grabbed both of [Goodson's] breasts because she hit both of his testicles."  *Id.*  Peay was unimpressed.  In his words, Compton's story was "not very convincing."  *Id.*  Compton denied Goodson's other allegations, and emphasized he had no "feelings" for Goodson.  He described what he had done as "horse play."  *Id.* at 19.

Peay spoke to several other officers that day.  None said they had seen Compton assault Goodson, and none said Goodson's behavior toward Compton had changed since the late Spring, when she said the harassment had begun.  *See generally id.*  One other officer, Deanne Lamar, remembered that a few weeks before, Goodson had told her what Compton was doing.  *See id.* at 20.  Goodson had also told her parents Compton had assaulted her before she reported it to the County.  *See* Trial Tr. 508–09, 516; Jeffrey Goodson Dep. at 17–18, ECF No. 123.

Compton never went back to work at the jail.  He instead resigned his position to take another job.  Trial Tr. 562; Compton Dep. 80, ECF No. 124.  As a result of Compton's resignation, and because detectives thought they had little evidence to prove Compton had acted "for the specific purpose of sexual arousal, sexual gratification, or sexual abuse" under the criminal statute, the investigation fizzled.  *See* Joint Ex. 16 at 2.

At trial, Compton denied Goodson's harassment claims, but his denial was not more credible than Goodson's testimony.  Nothing about her behavior or testimony at trial suggested she was lying or inventing assaults that had never occurred.  She related her experience with great emotional difficulty, and her emotions appeared to be genuine.  Peculiar details in her account— such as Compton's claim to her body as "community property" and the artifice of finding a "bug" in her hair—seem unlikely to have been contrived.  None of the people who spoke to her at the time questioned her truthfulness, memory, or the authenticity of her emotions; they believed her.  This is not to say Goodson's memory of the assaults was flawless or her testimony perfectly consistent.  Her memories of dates and events were sometimes patchy.  The court finds, however, these inconsistencies are better ascribed to the distance of years than untruthfulness or constructed memories.  They do not undermine her credibility, as her testimony broadly fits both Peay's report of his initial interview and her own handwritten notes, both of which were prepared soon after the assaults.  She also told a coworker and her parents about the assaults close in time to their happening.

The County emphasized at trial that Goodson's testimony was uncorroborated by any other officers' testimony.  It is true no other officers claimed to have seen the harassment.  Nor did they say Goodson was avoiding Compton.  They did not think she seemed sad or detached,

and they noticed no change in her behavior at the time.  Goodson's claims were not uncorroborated, however.  Officer Lamar and Goodson's parents all claimed she told them about the harassment before she reported it to the County.  And in any event, the absence of direct corroborating evidence does not disprove Goodson's testimony.  An officer like Compton, who was familiar with the jail and its security systems, had the knowledge to avoid cameras and other officers.  Goodson also credibly explained that she was attempting to conceal her emotions because she feared retaliation.

Compton's story of the harassment, in contrast with Goodson's, changed dramatically over time.  He first lied to investigators before incrementally admitting to several of Goodson's allegations, including that he had touched her breasts and buttocks, that he had used control holds in a way that might have seemed sexual, and that he cornered her in a closet and assaulted her.  Compton's explanations also changed after he spoke with Detective Peay.  He described his actions to Peay as ill-considered but purposeful.  At trial, by contrast, Compton said he wanted only to scare Goodson, not to assault her or grab her breasts, and he claimed to have made contact with her breasts by accident.  Trial Tr. 604.  Once put on leave, Compton also quickly resigned, which relieved him of closer scrutiny.

Like Goodson, Compton was openly emotional when he testified at trial, and like Goodson, his emotions appeared not insincere.  In contrast with Goodson's emotional response, however, it is difficult to draw any conclusions for this case from Compton's emotional difficulty on the witness stand.  His difficulties were most pronounced when he testified about his father's criminal history, which included a rape conviction, and the prospect of living with a similar reputation.  *See* Trial Tr. 636–37.  A truthful accusation of sexual assault could engender that emotional response just as a false allegation could.  In sum, as stated above, Goodson's testimony of Compton's assaults overall is credible, and Compton's denials are not.

As Goodson feared, soon after she reported Compton, she came under scrutiny herself.  After Compton called Gott to tell her he was on leave, and after detectives interviewed Goodson's coworkers about her allegations, gossip began to spread.  *See, e.g.*, Joint Ex. 7 at 38, 45.  At least some officers thought Goodson should be the target of an investigation, not Compton.  *See id.* at

45.  Goodson was well-known to be friends with an inmate named Robert "Kip" Hymas, and some officers thought this friendship was inappropriate.  *See, e.g.*, *id.* at 34–37, 44–45.  Sergeant Gott remembers vividly how one former officer expressed his frustrations.  Trial Tr. 748 "Compton is going to lose his job for some bullshit," he asked, "but Wagner's not for her shit with Hymas?"  Joint Ex. 7 at 45.

Hymas is a former officer of the California Highway Patrol.  Trial Tr. 84.  In 2017, he was charged with multiple felony offenses, including assault with a deadly weapon and domestic abuse.  Joint Ex. 9 at 11; *see also People v. Hymas*, No. C087737, 2021 WL 4988016, at *1–4 (Cal. Ct. App. Oct. 27, 2021) (unpublished) (summarizing charges, evidence, and criminal case).  Several officers in the jail had known Hymas before he was detained.  Trial Tr. 91–94, 794–95.  According to Goodson, "Everyone was his friend."  Trial Tr. 85.  Goodson had herself known Hymas for several years by the time he was arrested.  *See* Trial Tr. 84–85.  They had become closer during the year or so before his arrest.  *Id.*

Goodson's relationship with Hymas continued in the jail.  As a result of Hymas's charges and his history as a law enforcement officer, he was housed in a more secure area of the jail, and his schedule was inverted from that of an ordinary inmate: he was locked down in the day and released to the common "dayroom" at night.  Trial Tr. 88–89.  Because Goodson worked the night shift, she was usually in the jail when Hymas was awake and in the dayroom.  Trial Tr. 89. They often spent several hours talking through the door that separated the dayroom from the jail's hallway, and occasionally Goodson took Hymas out of the dayroom to the staff locker room, the sergeant's office, or a restroom to do chores and talk, sometimes for hours.  *See, e.g.*, *id.* 680–85.

By the time Goodson reported Compton, her coworkers had known for months that she was spending time with Hymas during her overnight shift.  Soon after Hymas first came to the jail as an inmate, Goodson told Officer Ah Wah she would "go to Hymas" if she were not already married.  Joint Ex. 7 at 33.  Ah Wah didn't make anything of it because Goodson seemed to laugh it off.  *Id.*  Later, others saw Goodson speaking to Hymas and entering his cell, and they heard rumors Goodson was taking Hymas "out of his cell to work in the laundry room or staff locker room . . . for long periods of time."  *Id.* at 34; *see also id.* at 36, 37.  Daniel Perreault worked

several graveyard shifts alongside Goodson during the time Hymas was in the jail.  Trial Tr. 683–84.  Perreault remembers Goodson and Hymas spending a lot of time together.  Trial Tr. 680.  "She would frequently talk with him after he was let out of lockdown."  Trial Tr. 680–81.  "[I]t was usually at least an hour.  Sometimes it was two or three hours."  Trial Tr. 681.  He also saw Goodson take Hymas from the cell area to the locker room or break room.  Trial Tr. 684–85.

Some of Goodson's coworkers had warned her not to spend so much time with Hymas.  It did not "look good," Officer Lamar told her.  Trial Tr. 269.  Her coworkers had also mentioned concerns to their supervising sergeants.  *See* Joint Ex. 7 at 36.  For example, about a month before Goodson reported the sexual harassment by Compton, one of Goodson's coworkers came to Compton and another sergeant, Shawn Adams, with concerns about the relationship between Goodson and Hymas.  *See* Trial Tr. 788–89, 792, 793.  Compton and Adams told this officer they already knew about it and not to worry.  *See id.*  At trial, Sergeant Adams said he saw no need to report anything higher up the chain of command.  Trial Tr. 794.  "Talking to an inmate for an extended period of time didn't really bring up a flag," he explained.  *Id.*  Adams himself knew Hymas, and he had also spoken with Hymas in the jail.  *Id.*

Nor were close personal relationships alone a cause for concern in a small-town jail.  Commander Hermann's son Tanner worked as a correctional officer under his supervision.  *See* C. Hermann Dep. at 61, ECF No. 132.  Goodson's brother was an inmate in the jail while she was a correctional officer.  Trial Tr. 206.  And Sergeant Adams's own mother was once an inmate in the jail while he worked as a correctional officer.  Trial Tr. 800.  Officers and supervisors were instructed to be professional despite their personal relationships: "No special privileges."  Trial Tr. 830.  As Sergeant Adams put it, officers were to "treat everybody the same when they come through that back door with fairness and firmness."  Trial Tr. 800–01.

Compton also confirmed at trial that he knew Goodson was spending time with Hymas.  He described one day in particular.  *See* Trial Tr. 610.  He came to the jail at the start of his shift and saw an inmate had not been booked overnight.  Trial Tr. 613.  He asked Goodson why, and she attributed the delay to the inmate's intoxication and aggressiveness.  *Id.*  After looking into it and speaking to other officers, Compton came to believe the true reason for the delay was the

1   time Goodson was spending with Hymas.  *See* Trial Tr. 614–18.  He heard from other officers

2   that it was common for Goodson to talk with Hymas during her shift.  *See* Trial Tr. at 615.

3   Compton warned Goodson about spending too much time with Hymas, but he did not tell her the

4   relationship itself was inappropriate.  Trial Tr. 618–19.

5        Commander Hermann heard about this incident, but he relied on Compton to clear it up

6   and had no deeper concerns.  Trial Tr. 854–55.  He also knew Goodson and Hymas were friends.

7   When Hymas went to trial, Goodson told Hermann she and Hymas were friends, and she asked

8   for permission to attend.  Trial Tr. 846.  Hermann allowed her to attend out of uniform.  *Id.*

9   Goodson attended the trial, and the District Attorney's office complained to Hermann.  *See* Trial

10  Tr. 847.  According to these complaints, Goodson was rolling her eyes and crossing her arms in a

11  way that suggested skepticism of the prosecution's case.  *See id.*  Commander Herman told

12  Goodson about this complaint, and he said that if she was "going to attend, she needed to remain

13  professional and show herself as nonemotional, not attached."  *Id.*  Goodson interpreted this

14  instruction differently than Hermann meant it.  She thought he was indifferent to what she did

15  while she was not on duty, as long as she kept it "outside of the public's eye."  Trial Tr. 87.  In

16  reality, Hermann says he meant only to say that she could attend the trial if she acted

17  professionally and unemotionally.  *See* Trial Tr. 847–48.

18       Sergeant Gott saw Goodson attend Hymas's trial, and she had concerns about Goodson's

19  behavior as well, but for different reasons.  *See* Joint Ex. 7 at 44.  One day near the end of the

20  trial, Hymas was sitting in a patrol car in handcuffs.  *Id.*  Gott saw Goodson wearing civilian

21  clothes and leaning into the car through an open back door, talking to him.  *Id.*  In Gott's view,

22  this was inappropriate.  Trial Tr. 723–24.  Gott sent Goodson away, but she did not report the

23  incident at the time.  Trial Tr. 724.  Goodson also tried to join Hymas for lunch during the trial,

24  and she was not wearing her uniform.  *See* Trial Tr. 725.  This seemed inappropriate to Gott, but

25  again, she did not report it at the time, Goodson faced no discipline, received no reprimands and

26  suffered no consequences.  *See id.*

27       The jury returned a guilty verdict at the conclusion of Hymas's criminal trial.  He stayed

28  in the county jail for a few more months awaiting sentencing and his transfer to state prison.  *See*

1   Trial Tr. 104–05.  It was during this interval when Goodson reported that Compton had harassed

2   her.  *See id.*  And it was only then—after Goodson reported being harassed by Compton, and after

3   rumors began circulating that Compton could lose his job—that Goodson's coworkers and

4   County officials began to take a harder look at Goodson's relationship with Hymas.

5          According to the County, the impetus for that harder look was, at least nominally, a

6   complaint about good time credits from an inmate named Kenyon Norberg.  Norberg did not

7   testify at trial.  Most of the evidence about his complaint and interactions with officers was

8   second-hand.  With that limitation, the record suggests Norberg first mentioned his frustrations to

9   Officer Ah Wah at about the same time Compton went out on leave.  *See* Joint Ex. 7 at 40.

10  Norberg thought he should be released within a week, but according to a report by Ah Wah,

11  Norberg's true release date was actually "a little later."  *Id.*  Norberg was upset when Ah Wah

12  broke this bad news, and he asked to file a formal grievance against Goodson; he thought she had

13  delayed paperwork that would have accelerated his release.  *See id.*  When Ah Wah brought

14  Norberg a complaint form, Sergeant Gott came with her "to explain how the credits work."  *Id.*

15  Gott tried to explain, but Norberg became "upset."  *Id.*  Ah Wah and Gott then took him to the

16  library.  *Id.*

17         Sergeant Gott spoke with him first.  *Id.* at 41.  According to Gott, Norberg told her he

18  thought Goodson had not completed his paperwork because she was spending so much time

19  talking to Hymas.  *Id.*  When Gott pressed him, Norberg said Goodson's conversations with

20  Hymas were flirtatious.  *Id.*  Gott asked Norberg if he had seen any physical contact.  He said

21  "yes, he had seen them kiss."  *Id.*

22         Gott radioed Officer Tanner Hermann, the son of Chad Hermann, the jail commander.  *Id.*

23  She told Norberg to repeat everything he had just said, now with Tanner Hermann in the room

24  with them to hear.  *Id.*  Norberg was reluctant at first.  He said he did not want to see Goodson get

25  in trouble.  *Id.* at 42.  But Gott did not relent, and Norberg said again Goodson was spending

26  many hours talking to Hymas and acting flirtatiously around both him and another inmate named

27  Gary Clark.  *Id.*  Gott asked again if there had been any physical contact.  *Id.*  Norberg's story

14

1    changed a bit: he did not claim he had seen them kissing, but he could "guarantee" they had

2    kissed.  *Id.*

3         Gott and Officer Hermann then locked Norberg in the library for the next ninety minutes

4    and ordered him to write out everything he had just said.  *See id.* at 40–42.  A copy of a three-

5    page complaint in Norberg's handwriting was admitted into the record at trial.  *See* Def. Ex. CC;

6    *see also* Joint. Ex. 7 at 30–32.  It focuses on Norberg's claims about his good-time credits.  Only

7    the last page mentions Hymas.  Norberg said Goodson and Hymas often spoke for several hours

8    about "his case," "his appeal," the court, "everything."  Def. Ex. CC at 3.  He wrote nothing about

9    flirting or kissing.  Instead he wrote about worries for Goodson's safety.  *Id.*  Tanner Hermann

10   then called his father, the jail commander, to report Norberg's complaint.  *Id.* at 24, 42.

11   Commander Hermann told them to interview Hymas.  *Id.*

12        Hymas "denied everything" and wrote it off as "inmates talking."  Joint Ex. 7 at 41.  "He

13   claimed that every now and then Sergeant Kelley and [Officer] Wagner would talk with him and

14   'check in,' but no conversation was over five to ten minutes."  *Id.* at 42.  According to a report

15   Officer Perreault wrote a few days later, two other inmates in the jail had similar things to say

16   about Norberg's complaint: he was "telling the officers lies about [Goodson] messing around with

17   that CHP guy here" and "[t]here is no way in hell any of that is true."  *Id.* at 46.  They thought

18   Norberg "just had it out for [the officers] because of the first time [he] didn't get his pass, then he

19   decided to target one of your guys."  *Id.*

20        The next day, Tanner Hermann spoke with his father again.  *Id.* at 24, 42.  Commander

21   Hermann instructed his son to review video from the jail's security cameras to see if it

22   corroborated Norberg's complaint.  *Id.* at 24–25.  Commander Herman then interviewed the three

23   inmates implicated by Norberg's complaint: Norberg himself, Clark, and Hymas.  *Id.*  Norberg

24   told Hermann that Goodson often spoke alone with Hymas through the food slot in the dayroom

25   door or through his cell door, sometimes for hours, mostly about Hymas's legal case and

26   Goodson's application to join the highway patrol.  *Id.* at 24–25.  Hermann asked if Norberg had

27   seem them touch.  *Id.* at 25.  Norberg hesitated at first, but agreed; according to Hermann's

report, Norberg said Goodson and Hymas had kissed.  *Id.*  Norberg also said Goodson had acted flirtatiously.  *Id.*

Hermann spoke to Gary Clark next.  Clark agreed Goodson had often spent a long time speaking with Hymas, mostly about Hymas's wellbeing and his case.  *Id.* at 26.  Clark described Goodson's behavior as overly familiar and sometimes flirtatious, but he had never seen kissing.  *Id.*  Like other inmates in the jail, he suggested Norberg's story was untrustworthy and motivated by a retaliatory desire to punish Goodson for delaying his release.  *Id.*  In Clark's view, Goodson was a "good correctional officer" who had "helped him through some tough times," but he found it unwise for her to be so familiar with an inmate.  *Id.* at 26–27.  According to Commander Hermann's report of the interview, Clark "could understand that her behavior would need to be corrected before it got out of hand and taken the wrong way."  *Id.* at 26.

Meanwhile, Tanner Hermann had checked video from the jail's security cameras.  *See id.* at 25–26.  He found video of Goodson speaking to Hymas for "a few hours" through a cell door and spending "a few hours" with Hymas in the sergeant's office and staff locker room, but he saw no kissing or physical contact.  *Id.*  He relayed this information to Commander Hermann, who then spoke to Hymas.  *See id.* at 27.  Hymas denied spending long hours talking to Goodson, and he became defensive when Commander Hermann confronted him with the surveillance video.  *See id.*  Hymas said he and Goodson had been friends "for a long time" and changed the subject.  *See id.*

Norberg was released from the jail the same day as his interview with Commander Hermann.  Joint Ex. 7 at 46.  This was earlier than even Norberg had expected.  As noted, he had thought his release date was the following week, and Officer Ah Wah had told him he would actually be released even later.  *See id.* at 40.  No one explained Norberg's early release at trial, but Goodson's counsel did not press for an answer.  *See, e.g.*, Trial Tr. 754 (Gott "do[es]n't recall" if Norberg released day after filing complaint).  In her deposition, which is part of the trial record by the parties' agreement, *see* Trial Plan, ECF No. 102, Goodson testified she thought Norberg was ineligible for an early release because he had smuggled drugs into the jail.  Goodson Dep. at 193, ECF No. 111.

Taking a step back, then, at this point in the investigation, it appears Commander Hermann had learned what several correctional officers and sergeants had known for weeks, if not months: Goodson and Hymas were on friendly terms, and they often spoke in the jail during her overnight shift, sometimes for hours, and sometimes while Hymas did chores outside his cell. The only new evidence was Norberg's uncorroborated and inconsistent claim that he had seen Goodson kissing Hymas—a claim other inmates believed to be false, and a claim Norberg might have invented given his own equivocation when pressed by Gott.

But more troubling evidence soon surfaced.  On the afternoon Commander Hermann interviewed the three inmates, Goodson came into the jail even though it was her day off.  Joint Ex. 7 at 47.  She wanted to speak to Gott.  *Id.*  This was unusual.  *Id.*  She was not in the habit of coming in to talk on her day off.  *Id.*  Gott wondered whether Goodson was trying to learn about the investigation into Norberg's claims, and she wondered whether Hymas had somehow tipped her off.  *See id.*  Gott looked at the logs of Hymas's outgoing calls from the jail's phone.  *See id.* They showed Hymas had often called two phone numbers late at night, one registered to "Sam Hunt," and another registered to "Samantha Watson."  *Id.* at 28, 47.  Gott listened to portions of the calls and heard Goodson's voice on some of the calls made under these names.  *See id.* at 47. The calls made clear to Gott that Goodson was speaking to Hymas while she was off duty, and she was using prepaid cell phones registered under pseudonyms.  *See id.*  Gott told Commander Hermann, *see id.*, and the Sheriff's Office put Goodson on administrative leave the next day based on its suspicion that she had engaged in "serious misconduct related to [her] position as a correctional officer," Joint Ex. 2 at 1; *see also* Trial Tr. 81–82.

A few days later, Commander Hermann listened to the recorded calls Hymas made to the "Sam Hunt" and "Samantha Wilson," including at least one additional call made after Gott's review.  Joint Ex. 7 at 28–29.  He agreed it was Goodson's voice.  *Id.*  The most recent call was from the day before.  *Id.* at 29.  During that call, Hymas and Goodson had spoken about the investigation into their relationship.  *Id.*  At the end of the call, Hymas asked Goodson if she was pregnant.  *See id.*  "Maybe," she said.  *Id.*  These phone calls raised the possibility of serious misconduct:  Was Goodson attempting to conceal her identity from those who might check the

1  call logs?  Was her relationship with Hymas sexual?  Hermann asked Gott to collect any

2  information she could about Hymas and Goodson's relationship from other officers in the jail.  *Id.*

3  Hermann also asked Detective Peay—the same man who was investigating potential charges

4  against Compton—to look into the relationship between Goodson and Hymas.  *Id.* at 16, 29.

5  Peay interviewed several officers over the next few days.  *See id.* at 10–15.  He and another

6  detective then went to Goodson's home.  *See id.* at 17.

7      The notes of Peay's interview of Goodson paint a picture of an interrogation.  *See id.* at

8  17–19.  After Goodson described her relationship with Hymas as friendly, the detectives told her

9  they "knew" there was an "inappropriate relationship between the two of them."  *Id.* at 17.  When

10  Goodson insisted they were just friends, the detectives told her they "felt differently" and said

11  they knew the two had been alone "many times in the jail."  *Id.*  When Goodson said they were

12  just cleaning, the detectives "questioned the time."  *Id.*  And when she told them how long they

13  had been cleaning, they said "the videos were a little different on the times compared to what she

14  was saying."  *Id.*  The detectives asked her whether she had touched or hugged Hymas and

15  whether their relationship was sexual.  *Id.* at 18.  She said they had not had sex, and she began to

16  cry.  *Id.*  She said Hymas was a friend, she was fond of him, they had hugged and kissed, and

17  "maybe they were going to go together if he got out of jail and was not convicted."  *Id.*

18      The detectives then asked Goodson about the off-duty calls on prepaid phones.  *Id.*  She

19  said she did not know what they were talking about.  *Id.*  Peay explained: "the phones that she has

20  that she and Hymas talk on."  *Id.*  Still she pretended not to understand.  *Id.*  Peay said he knew

21  about the phones and asked for them, and Goodson eventually admitted she had spoken to Hymas

22  by phone while she was off duty, and she admitted they had spoken about having sex.  *Id.* at 18–

23  19.  But she adamantly denied having any sexual contact with Hymas.  *Id.* at 19.  She dismissed

24  Hymas's comment about her possible pregnancy as a joke about her grumpiness that day.  *See id.*

25      The Sheriff's Office referred both Compton and Goodson to the District Attorney's

26  Office—Compton under suspicion of sexual assault, *see* Joint Ex. 16 at 1, and Goodson under

27  suspicion of sexual contact with an inmate, *see* Joint Ex. 7 at 1.  The District Attorney declined to

28  pursue criminal charges against either of them.  *See* Joint Ex. 7 at 2; Joint Ex. 16 at 2.  First, the

1   District Attorney did not believe there was "any evidence" that Compton had committed a crime.

2   Joint Ex. 16 at 2.  Compton and Goodson were the only direct witnesses to the assault, so any

3   prosecution would depend on Goodson's testimony, and the District Attorney questioned her

4   credibility after her "false statements" during the investigation into her relationship with Hymas.

5   *Id.*  Second, as for potential charges against Goodson, the District Attorney concluded his office

6   could not prove she and Hymas engaged in "sexual activity," as would be necessary under the

7   relevant section of the penal code.  Joint Ex. 7 at 2.  "That being said," he clarified, "I am not

8   convinced there was not sexual activity."  *Id.*  "[I]t is simply something that cannot be proven

9   after all investigative approaches have been exhausted."  *Id.*

10        After the District Attorney declined to pursue criminal charges against Goodson, the

11   Sheriff's Department assigned Sergeant Steve Clark to investigate whether Goodson had violated

12   the Sheriff's Department's policies on inmate security, sexual contact with an inmate, sexual

13   harassment, truthfulness and recordkeeping, among other topics.  Joint Exs. 3–4; Trial Tr. 420.

14   While that investigation was ongoing, Hymas was transferred to the High Desert State Prison to

15   serve his sentence following conviction.  Joint Ex. 9 at 11.  Goodson visited him there while she

16   was on leave.  Trial Tr. 85; Joint Ex. 14 at 4.  By this time, her feelings for him had become

17   intimate.  *See* Trial Tr. at 235, 277; *see also* Joint Ex. 14 at 1.  Goodson also filed this lawsuit at

18   about the same time.  *See generally* Compl., ECF No. 1.  She asserted sexual harassment and

19   retaliation claims against the County, the Sheriff, and Compton under the California Fair

20   Employment and Housing Act and under Title VII of the federal Civil Rights Act of 1964.  *See*

21   *generally id.*

22        Soon after Goodson filed this lawsuit, she learned Hymas might be transferred to a

23   different state prison.  *See* Joint Ex. 14 at 6.  She feared the County had asked the prison to

24   transfer him to a prison further away in retaliation for her lawsuit, so she contacted a correctional

25   officer at the state prison.  *See id.*  The officer assured her the transfer had nothing to do with the

26   County or her lawsuits.  *See id.*  The next month, Goodson contacted the officer again to warn

27   him that she had received an anonymous letter from someone within the prison suggesting Hymas

28   could be targeted as a result of his history in law enforcement.  *See id.* at 6–7.

Although no evidence suggests the County sought Hymas's transfer to a distant state prison, the County does appear to have pursued renewed criminal charges against Goodson soon after she filed her complaint in this case.  Sergeant Clark was monitoring video and audio recordings of Goodson's meetings with Hymas in the state prison while she was on leave.  *See* Pl. Ex. 40A at 2.  In a video of one visit, he saw Goodson using sign language and notes.  *Id.*  He suspected Goodson was attempting to hide something.  *Id.*  He wrote a memo detailing his concerns and recommending charges, and soon after the district attorney for the county where the state prison was located filed a criminal complaint against Goodson.  Pl. Ex. 40 at 1.  According to that complaint, Goodson had "unlawfully, and knowingly communicated with a person confined in state prison," a misdemeanor.  *Id.*  The County instructed Goodson to cease all contact with Hymas.  Joint Ex. 15 at 1.

Goodson was soon arraigned on criminal charges in the county where the state prison was located, but the prosecutor assigned to the case moved to dismiss the charges.  Pl. Ex. 40 at 3–4.  In his view, Goodson's actions "did not justify the further investment of scarce judicial resources."  Funk Decl. ¶ 4, ECF No. 121.  It was doubtful she had engaged in any criminal conduct at all.  Pl. Ex. 40 at 4.  And even if she had, jurors "would be very unhappy were they empaneled" to hear such a petty case.  *Id.*

Several months later, the County finalized its investigation into Goodson's relationship with Hymas.  The results are memorialized in a 91-page report prepared by Sergeant Clark.  *See generally* Joint Ex. 9; Trial Tr. 421.  He listed thirty-two allegations of misconduct, and he found all thirty-two substantiated.  *See* Joint Ex. 9 at 11–91; Trial Tr. 421.

A number of Clark's findings are questionable or even incorrect.  His shakiest conclusions relate to Goodson's complaint against Compton.  Clark concluded that contrary to Goodson's complaint, she was the one who sexually assaulted Compton.  *See* Joint Ex. 9 at 16–18.  He believed she had made up the harassment and had filed a false criminal complaint against Compton, which is a crime.  *See id.* at 35–38, 78–81.  But Goodson did not file a criminal complaint.  The Sheriff's Office began a criminal investigation on its own initiative.  *See, e.g.*, Joint Ex. 16 at 1–3.  Nor does Clark's report explain why he ignored Compton's admission he had

1    forcefully grabbed Goodson's breasts after trapping her in a storage closet.  Detective Peay had

2    believed Goodson's harassment claims and had doubted Compton's credibility, and Compton

3    resigned soon after Goodson complained.  Clark's report says nothing of this evidence.  Similarly,

4    although Sergeant Clark condemned Goodson's participation in "horseplay" in the jail, he

5    minimized the many other officers' more frequent "horseplay."  *See* Joint Ex. 9 at 16–18.  As

6    summarized above, the accounts of Goodson's participation in the "horseplay" are contradictory

7    and inconclusive.  *See supra* note 1.  The evidence certainly did not show Goodson was cruder or

8    rougher than others; it suggests she was less rough and less crude than most.  But only she faced

9    discipline.  Clark's report does not contend with this inconsistency.

10          These omissions and inconsistencies suggest Sergeant Clark's report is not an objective

11   compilation of evidence.  A number of other similarly dubious conclusions underscore that

12   assessment.  For example, Clark concluded Goodson had spent so much time with Hymas that she

13   had not completed her duties.  *See, e.g.*, *id.* at 3–4, 8, 10, 11–13.  But the report cites only one

14   incomplete duty on one day—conducting jail safety checks—and it ties only two missing safety

15   checks to the time Goodson spent with Hymas.  *See id.* at 11–13; Trial Tr. at 456.  At trial it was

16   undisputed missing safety checks is not a serious offense and does not warrant termination, even

17   though checks are "very important."  Trial Tr. 454.  Goodson's counsel also engaged a data

18   expert to review the jail's safety check records.  *See* Edmonds Rep., Pl. Ex. 25.  The expert found

19   many other officers in the jail regularly failed to record safety checks.  *See id.* at 29–70.  Yet,

20   aside from Goodson, no officers faced discipline for inadequate safety checks.  Their supervisors

21   simply gave them warnings.  *See* Trial Tr. 111, 225–26.

22          Sergeant Clark also charged Goodson with falsifying jail records in an attempt to conceal

23   her failure to conduct safety checks.  *See* Joint Ex. 9 at 14, 74–77.  At trial, however, the evidence

24   did not support that claim.  The County cited only one entry.  Another officer could have made

25   that entry, and whoever made it had not used Goodson's credentials to access the computer.  *See*

26   Trial Tr. 113–18, 226; Resp. Interrog. at 5–6.

27          A number of other unrelated allegations in Sergeant Clark's report also were not proven at

28   trial.  For example, Clark found Goodson had attempted to use her status as a correctional officer

                                                     21

1    to benefit Hymas while he was in the state prison. *See* Joint Ex. 9 at 25–26. But as summarized

2    above, the evidence does not show Goodson attempted to influence anyone. She asked about the

3    reasons for Hymas's upcoming transfer and reported a threatening letter. Clark also charged

4    Goodson with racial discrimination and disparaging County officials. *See id.* at 25, 29–30. But

5    there is no evidence Goodson made racist comments. Rather, Hymas had, and the County

6    introduced no evidence showing Goodson endorsed or shared his views. *See id.*; Trial Tr. at 125–

7    26, 133–34. The only evidence the County introduced at trial to show Goodson disparaged

8    County officials was her "tacit" agreement with some of Hymas's criticisms of how the County

9    was handling his criminal case, which they discussed on the phone. *See* Joint Ex. 9 at 25; Trial

10    Tr. 472–74. The County faulted her for not telling Hymas "she could not be a participant in this

11    type of conversation." Joint Ex. 9 at 25.

12          The most serious charge in Sergeant Clark's report—that Goodson "engaged in sexual

13    relations (as defined under Penal Code 289.6) with an inmate"—rested on inferences from thin

14    evidence. Joint Ex. 9 at 88. Both Goodson and Hymas denied sexual contact in the jail. Neither

15    Goodson nor Hymas admitted to any sexual contact in any of their recorded conversations. No

16    one claimed to have witnessed sexual contact between Hymas and Goodson. No one other than

17    Norberg claimed to have caught them in a compromising position, and his report is not credible.

18    No one claimed even to have heard hearsay about a sexual relationship. The one officer most

19    likely to have seen anything, Daniel Perreault, Goodson's partner on the overnight shift at the

20    time, did not suspect she was engaging in any sexual activity with Hymas at the time. Trial Tr.

21    686. He would "absolutely" have reported it if he had. *Id.* The County prosecutor similarly

22    found "no evidence" that could prove Goodson and Hymas had sexual contact in the jail. Joint

23    Ex. 7 at 2.

24          Despite the shortcomings in Sergeant Clark's report, the evidence at trial bore out some of

25    his conclusions. As he found, Goodson had in fact maintained a close and inappropriately

26    personal relationship with Hymas while she was on duty, often speaking with him for several

27    hours during her shift. *See, e.g.*, Trial Tr. 209–11, 275–76, 288. She hugged and kissed him

28    while she was on duty, Joint Ex. 7 at 19, and she had personal phone conversations with him

while she was off duty, some of them explicitly sexual, Trial Tr. 124.  These actions violated the

Department's policy that officers maintain professional relationships with inmates.  *See, e.g.*,

Trial Tr. 209–11, 810–12; Joint Ex. 9 at 19, 24.  Goodson also often was alone with Hymas in

unsecured areas of the jail where there was no video surveillance, sometimes having taken off her

duty belt holding safety equipment.  *See, e.g.*, Trial Tr. 121, 331–32.  This put her and others at

risk and violated the Department's safety policies.  *See* Trial Tr. 463–64.  Finally, Goodson

attempted to conceal her off-duty phone conversations from detectives, *see, e.g.*, Joint Ex. 7 at

18–19; Policy § 340.3.5(p), Def. Ex. F at 2–4, and she spoke to Hymas about the investigation

into their relationship even though investigators had instructed her not to do so, *see* Joint Ex. 9 at

42–49.

Even if Goodson had reasonably misunderstood Commander Hermann's instruction at the

time of Hymas's trial to keep her relationship with him "out of the public eye," it would not have

been reasonable for her to conclude from that instruction that Hermann was permitting her to

have sexually explicit phone calls with Hymas while she was off duty.  The evidence shows

Goodson knew her phone calls were inappropriate: she attempted to hide her identity by using

prepaid phones registered under pseudonyms, and she at first feigned ignorance when

investigators confronted her.  In this respect, she was dishonest.

Sergeant Clark forwarded his report to Undersheriff Dean Canalia.  *See* Joint Ex. 1 at 2.

Canalia prepared a forty-page notice of the County's intent to terminate Goodson's employment,

which he sent to her in July 2019.  *See generally id.*  Canalia's tone was hyperbolic, insulting and

contemptuous.  "In my twenty-five (25) year career," he wrote, for example, "I have never been

confronted with the sheer magnitude and egregious nature of the departmental and criminal

transgressions you have committed which have resulted in violating both our department and the

public trust." *Id.* at 2.  He described her actions as "unprecedented," "corrupt," "beyond

reprehensible," "countless," and "extremely deplorable." *Id.* at 2, 36, 38.  He asserted she had

caused "grave embarrassment to this department." *Id.* at 21.  He charged her with "crimes . . . so

numerous and so flagrantly reprehensible that the Department's Policy Manual does not and

cannot comprehensively address" them. *Id.* at 36.  He claimed she had woven "a series of lies

23

which were so unbelievable and convoluting that the lies, themselves, were lies about other lies." *Id.* at 30.  He said her "moral compass" was "so defective" that it had "misguided" her to commit "virtually countless acts of corrupt misconduct" and concluded that no one could trust her "ever to do the 'right thing.'" *Id.* at 37.

Canalia did not check Sergeant's Clark's findings before writing his screed, or at any point correct his errors.  Canalia Dep. at 17, ECF No. 129.  He instead raised new unsupported claims of wrongdoing in his notice.  For example, Canalia concluded, without citing any evidence, that Goodson had "singlehandedly" thwarted the County's efforts to comply with a federal consent decree:

> [A]s you and all jail staff are aware, the Jail Facility is operating under a federal district court Consent Decree.  The jail staff has been diligently working to implement and comply with the terms of the Consent Decree which requires strict adherence to mandatory operational requirements such as jail checks.

> You have singlehandedly managed to undermine and compromise the validity and integrity of this Department's representations of compliance with the Consent Decree. More disturbingly from a "human" perspective are the damaging and demoralizing effects on the efforts of your colleagues who have been diligently striving towards compliance and improvement of jail standards.

Joint Ex. 1 at 15–16.  Canalia's conclusion that Goodson alone was to blame was false.  Many officers in the jail regularly failed to record safety checks.  *See* Edmonds Rep. at 29–70, Pl. Ex. 25.  None of them faced similar discipline.

Canalia similarly misstated the local District Attorney's decision not to file charges against Goodson.  As noted, the District Attorney found "no evidence" to support a charge, but at the same time, he was "not convinced there was not sexual activity."  Joint Ex. 7 at 2.  Canalia wrote incorrectly the District Attorney was "convinced" Goodson "had sex with Hymas."  Joint Ex. 1 at 34.  Canalia also claimed without evidence that Goodson had wrongfully attempted to secure Hymas's false exoneration and release outside the legal process:

> Your fellow officers performed their sworn duty and risked their safety by apprehending Hymas for his crimes and prevented further potential violence against the public.  As a result of their efforts

24

1       Hymas was convicted of his crimes through the legal process we are
2       sworn to uphold.  Yet, you would assist in facilitating his release
3       from custody and exoneration.  In so doing you violated your legal
4       and ethical duties as a law enforcement officer.

5   *Id.* at 17.  Canalia also claimed without evidence that the public feared Goodson because of her

6   relationship with Hymas, and he said that fear was justified:

7       [W]hether you realize it or not, there are citizens of Plumas County
8       who are equally afraid of you for their safety.  As your openly
9       assisting Hymas with his criminal appeal and your personal
10      relationship with him is well known to the county's small community
11      as a result of your own public statements and acts, their fear of you
12      is more than understandable and justified and irreparably
13      problematic for this Department.

14  *Id.* at 38.

15      Canalia also drew express connections between his decision, Goodson's sexual

16  harassment report, and her lawsuit in this court.  For example, he faulted her for talking about her

17  harassment claims and this lawsuit with Hymas even when she was off duty or on leave:

18      Although your independent civil action [this action] is your personal
19      business, the use of departmental resources such as the jail phone
20      Hymas was using to assist you in your personal legal affairs
21      constitute an abuse of departmental resources on your part.  The
22      public has the right to expect that their taxes are not being improperly
23      used by an inmate to contact you from the jail to assist you in your
24      personal legal actions against the County and, in turn, the taxpayers
25      who pay your salary.

26  *Id.* at 20.  He even blamed Goodson for wrongfully ending Compton's career:

27      I deeply regret that Sergeant Compton resigned before the
28      Administrative Investigation uncovered your despicable act of
29      falsehood which may have unnecessarily ended an employee's career
30      with this Department before the issue could have and should have
31      been more thoroughly investigated had your lies been discovered
32      earlier.  Based on this evidence, I can only assume that an innocent
33      individual was wrongly accused and suffered its consequences.

34  *Id.* at 32.

35      At trial, the County suggested similarly that Goodson had invented Compton's assaults in

36  an attempt to secure a large damages verdict and to distract from her own wrongdoing.  It cites

25

1    her suggestion on a recorded phone call with Hymas, which occurred several months after the

2    assault—and after she had reported it and hired an attorney—that a damages verdict could be

3    large.  Goodson's expression of hope for compensation does not show her previous reports were

4    lies.  Nor does the potential for a damages award show Goodson would pursue false claims for

5    many years, go to trial, and lie under oath in deposition and at trial.

6            Goodson's attempts to conceal her relationship with Hymas were dishonest, but her

7    dishonesty about her relationship with Hymas does not show she was lying when she came

8    forward with her complaint against Compton.  She feared retaliation if she complained, and she

9    wanted to keep her relationship with Hymas "out of the public eye."  A person who fears

10   retaliation for reporting harassment, who worries about the scrutiny that a harassment

11   investigation will bring and who hopes to conceal a problematic relationship with an inmate is not

12   someone who can be expected to invent a false sexual harassment claim, to file a complaint in

13   federal court and to pursue that complaint through years of litigation in which her sexual

14   relationships, her mental health and her finances are dissected and aired in the most public of

15   settings.  Her complaint against Compton was also corroborated by her previous reports to her

16   parents and a coworker.

17           The County referred Canalia's recommendation to terminate Goodson to an outside

18   officer, Glenn County Sheriff Richard Warren, for a hearing under *Skelly v. State Personnel*

19   *Board*, which guarantees state employees certain protections in advance of termination.  *See*

20   *generally* 15 Cal. 3d 194 (1975).  Sheriff Warren held a hearing and prepared a written

21   recommendation.  *See generally* Def. Ex. AA.  In contrast with Sergeant Clark's report and

22   Canalia's notice, Warren's tone was measured, and his conclusions were cautious.  He found the

23   case "very complicated" and the documentation "voluminous."  *Id.* at 2.  He found some of the

24   allegations against Goodson "were more substantiated than others."  *Id.*  He understood

25   Goodson's "perception that the investigation was retaliatory."  *Id.*  He recognized that the

26   complaint from Norberg had followed suspiciously close on the heels of her own complaint

27   against Compton; he described the timing of Norberg's complaint as "unpropitious."  *Id.*  But

26

1   Sheriff Warren found "no evidence that the grievance was contrived or solicited." *Id.*  At bottom,

2   he agreed with the recommendation to terminate Goodson's employment:

3           Based on the documents provided and the meeting with [Goodson],
4           it is clear that there was a prohibited association that led to multiple
5           policy violations.  It is also clear that [Goodson] was less than
6           forthcoming and highly deceptive during the administrative
7           investigation.  While this case is very complex and there are
8           allegations of sexual assault/harassment that need to be determined
9           by other means, it is reasonable that the conduct and policy violations
10          committed by [Goodson] merit termination.

11  *Id.* at 2–3.

12          The County terminated Goodson's employment in October 2019.  Second Am. Compl.

13  ¶ 56, ECF No. 50; County's Answer ¶ 56, ECF No. 52.  Goodson found a new job, so she

14  replaced a good portion of lost income and benefits, but not her pension benefits.  *See* Trial Tr.

15  157–58.  Her counsel engaged an economist, Charles Mahla, Ph.D., to estimate how much she

16  lost as a result of her termination.  *See generally* Mahla Report, Pl. Ex. 50.  By his estimation, a

17  payment of approximately $2.0 million would put Goodson in the same financial position she

18  would have been in if she had stayed on as a correctional officer in the same position and rank

19  throughout her career.  *See id.* at 11.  The payment would increase to approximately $2.4 million

20  if Goodson had been promoted to sergeant within about eighteen months.  *See id.* at 11–12.  The

21  County introduced no contrary estimates.

22          Goodson's mental and physical health declined as a result of the harassment, internal

23  investigation and termination, which occurred during a time in her life that was already difficult.

24  In 2018 and 2019, she was extracting herself from an abusive relationship with her former

25  husband, litigating a contentious divorce, and combatting financial difficulties.  *See* Trial Tr. 171–

26  96.  She also learned in the first half of 2018 that her daughter had been suffering abuse at the

27  hands of her former husband.  *See* Trial Tr. 174–75.  She was diagnosed with post-traumatic

28  stress disorder and severe depression.  Trial Tr. 258.  She became, in her words, "an absent

29  parent" to her children.  Trial Tr. 156.  "They would come in and talk to me and I would pretend I

30  was sleeping, so that I didn't have to engage," she explained.  *Id.*  "I did that with my entire

1   family.  There were days that my mom would come in and make me get out of bed just to shower.

2   I couldn't sleep, and I was always lethargic, but when I was awake, I wasn't attentive to anything

3   around me." *Id.*  Her hair fell out. *Id.*  She gained back a lot of the weight she had lost. *Id.*  She

4   was hospitalized for seizures. *Id.*

5            Goodson's attorneys engaged a psychologist, Anthony Reading, Ph.D., to evaluate her

6   mental health and offer an opinion about her injuries, treatment and prognosis. *See* Reading

7   Report at 1, Pl. Ex. 48.  In Reading's opinion, Goodson's symptoms and psychological testing

8   supported a diagnosis of posttraumatic stress disorder and depressive disorder. *See id.* at 29–31.

9   He concluded Goodson would not have developed these conditions but for her "work issues." *Id.*

10   at 31.  He specifically attributed her posttraumatic stress disorder to the sexual harassment. *Id.*

11   Symptoms of her depression appeared first only after her she made a complaint against Compton,

12   but in Reading's assessment, the trauma of sexual harassment is itself "a risk factor for the onset

13   of a depressive disorder." *Id.*  He did not believe her symptoms could be attributed to "[a]lternate

14   stressors," such as marital problems or custody disputes. *Id.* at 30.  Reading recommended two

15   years' weekly cognitive behavioral therapy and follow-up treatment "to deal with symptom

16   reactivation." *Id.* at 31.  He believes Goodson will need to continue a course of psychotropic

17   medication for several months, if not years, and perhaps throughout her life. *Id.*  Neither

18   Compton nor the County introduced any contrary evidence at trial.

19            Finally, Goodson's counsel retained an attorney with experience in sexual harassment

20   investigations, Amy Oppenheimer, to assess the County's response to Goodson's complaint. *See*

21   Oppenheimer Report at 1, Pl. Ex. 49.  In Oppenheimer's opinion, the County fell short of relevant

22   professional standards by treating Goodson's complaint as a criminal complaint and by focusing

23   too narrowly on sexual assault. *See id.* at 7–8.  Oppenheimer also believes the County erred by

24   investigating Goodson's harassment complaint concurrently with its investigation into allegations

25   against her, *see id.* at 9–10, by treating her like a suspect or target rather than as a witness or

26   victim, *see id.* at 9, by not referring her complaint to a human resources investigator, *see id.* at

27   10–11, and by inadequately protecting against retaliation, *see id.* at 10, 11.  The County did not

28   introduce expert evidence to refute or rebut Oppenheimer's opinions.

1   As noted, Goodson had already filed this case when she was terminated, and this court

2   granted her motion for leave to amend her complaint after her termination.  Order (Feb. 19,

3   2020), ECF No. 26; First Am. Compl., ECF No. 30.  After she further amended the complaint by

4   stipulation, ECF No. 50, the discovery deadline passed, and the court set a trial date, *see* Order

5   (Dec. 3, 2021), ECF No. 68; Final Pretrial Order, ECF No. 76.  The court held a six-day bench

6   trial in August 2022.  *See* Mins., ECF Nos. 118, 131, 133, 152, 154, 156.  At trial, Calvin Chang

7   and Joseph Maloney represented Goodson, Margaret Long represented the County, and Serena

8   Warner represented Compton.

9   While this case has been pending, Hymas completed his prison sentence and moved to

10   Idaho.  Trial Tr. 235.  At the time of trial, Goodson was living with him part time.  *Id.*

11   **III.   CONCLUSIONS OF LAW**

12   Goodson asserts claims in two categories.  First, she claims Compton and the County are

13   liable under California and federal law for creating a sexually harassing and hostile work

14   environment.  Second, she claims the County is liable under state and federal law for retaliating

15   against her for reporting harassment.  As explained in the first two sections below, parts A and B,

16   the evidence presented at trial supports some of her harassment and retaliation claims, but not

17   others.  In the third section, part C, the court determines what remedies are appropriate.

18   **A.   Harassment**

19   Goodson first claims Compton and the County are liable for sexual harassment under

20   California law.  The Fair Employment and Housing Act makes it an unlawful employment

21   practice to harass employees because of their sex.  *See* Cal. Gov't Code § 12940(j)(1); *Lyle v.*

22   *Warner Bros. Television Prods.*, 38 Cal. 4th 264, 277 (2006) (citing statute).  To prove a claim of

23   sexual harassment, a plaintiff must show she was a member of a protected class; she was

24   subjected to unwelcome harassment based on that protected status; the harassment "unreasonably

25   interfered" with her work performance "by creating an intimidating, hostile, or offensive work

26   environment"; and the defendant is liable.  *Ortiz v. Dameron Hosp. Ass'n*, 37 Cal. App. 5th 568,

27   581 (2019); *see also* J. Council of Cal. Civil Jury Instr. 2521A (2022) (listing elements).

The California Supreme Court has held "to prevail, an employee claiming harassment based upon a hostile work environment must demonstrate that the conduct complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex." *Miller v. Dep't of Corr.*, 36 Cal. 4th 446, 462 (2005) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  To meet this standard, an employee must show both that she actually perceived the workplace as hostile or abusive and that "a reasonable person" in her position would have shared that perception, "considering all the circumstances." *Lyle*, 38 Cal. 4th at 284.  Those circumstances might include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Miller*, 36 Cal. 4th 462 (quoting *Harris*, 510 U.S. at 23).

Based on the evidence presented at trial in this case, Goodson meets this standard.  Goodson showed she was subjected to a hostile work environment based on her sex.  Compton made several unwelcome comments about sex, touched her body, ground his pelvis against her, restrained her, grabbed her, hit her, bit her, licked her, said her body was his to do with as he liked and told her she knew she loved him.  His behavior was severe and persistent, and he implied she would suffer negative consequences in her job and career if she reported him.  Goodson found the environment hostile and abusive.  She avoided Compton, protested, told him to stop, and eventually reported his behavior as sexual harassment.  She came to the conclusion she could no longer do her job if it meant working with him, and she reported him despite her belief she might be ending her career in law enforcement as a result.

The County cannot prevail by pointing out that many other officers took part in juvenile, sexually charged and often violent roughhousing at work.  Goodson did not complain about this "horseplay."  She complained about what Compton did—she feared him and asked him to stop—and his conduct was much more severe.  His harassment also affected her severely.  She developed post-traumatic stress disorder and depressive disorder.  A reasonable person in Goodson's situation would have found this harassment was severe and had created a hostile

1  environment.  Derogatory sexual comments, assaults, and physical interference with work are

2  widely recognized as sexual harassment.  *See, e.g.*, *Lyle*, 38 Cal. 4th at 280–81; *Miller*, 36 Cal.

3  4th at 461.

4      What remains is the final element of Goodson's claim: liability.  First, under state law, "an

5  employee who harasses another employee may be held personally liable."  *Lewis v. City of*

6  *Benicia*, 224 Cal. App. 4th 1519, 1524 (2014) (citing Cal. Gov't Code § 12940(j)(3)).  Compton

7  is therefore personally liable.  Second, California law makes employers strictly liable for "all"

8  sexual harassment by a "supervisor."  *State Dep't of Health Servs. v. Superior Ct.*, 31 Cal. 4th

9  1026, 1042 (2003) (emphasis omitted).  A person is a supervisor if he could "assign, reward, or

10  discipline other employees" or had "the responsibility to direct them."  *See* Cal. Gov't Code

11  § 12926(t).  By this definition, Compton was a supervisor.  He signed Goodson's performance

12  reviews, arranged her work schedule, and gave her instructions.  For these reasons, both Compton

13  and the County are liable for creating a sexually hostile work environment in violation of

14  California Government Code section 12940(j).

15      Goodson also asserts a claim against the County under Title VII of the federal Civil Rights

16  Act of 1964.  The County moves for judgment in its favor on this claim, and Goodson does not

17  oppose that motion.  *See* Trial Tr. at 905.  The court agrees the County is entitled to judgment in

18  its favor for this claim.  Employers can be directly liable for harassment if they were "negligent

19  with respect to the offensive behavior."  *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013).

20  Here, Goodson did not show the County was negligent with respect to the harassment itself.

21  Employers can also be liable for an employee's harassment vicariously if they "empowered that

22  employee to take tangible employment actions against the victim, i.e., to effect a 'significant

23  change in employment status, such as hiring, firing, failing to promote, reassignment with

24  significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Id.*

25  at 431 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  Goodson did not

26  show Compton had authority to change her employment status.  For these reasons, the court

27  grants judgment to the County on Goodson's harassment claim under Title VII of the Civil Rights

28  Act.

31

1    Finally, Goodson asserts a claim against the County for failure to prevent harassment

2  under state law.  The County moves for judgment on this claim as well, and again Goodson does

3  not oppose.  Trial Tr. at 905–06.  The court agrees the County is not liable for failure to prevent

4  harassment.  To prevail on that claim, Goodson must show the County did not "take all

5  reasonable steps necessary to prevent discrimination and harassment from occurring."  Cal. Gov't

6  Code § 12940(k).  At trial, Goodson did not identify reasonable steps the County should have

7  taken to prevent the harassment itself.

8    In sum, Compton and the County are liable for sexual harassment in violation of the

9  California Fair Employment and Housing Act, but not under federal law.  Nor is the County liable

10  for failure to prevent harassment under state law.

11    **B.    Retaliation**

12    Goodson asserts two retaliation claims against the County, one under state law and one

13  under federal law.

14    The Fair Employment and Housing Act makes it an unlawful employment practice for an

15  employer to discharge a person for opposing an unlawful employment practice, such as

16  harassment.  *See* Cal. Gov't Code § 12940(h).  California courts use a three-step process in trying

17  retaliation claims.  *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005).  An

18  employee must first establish a "prima facie case" of retaliation by showing (1) she engaged in a

19  protected activity, (2) her employer subjected her to an adverse employment action, and (3) there

20  was "a causal link" between the protected activity and the adverse action.  *Id.*  Goodson

21  established a prima facie case of retaliation at trial: (1) she reported sexual harassment by

22  Compton and filed a sexual harassment lawsuit against the county; (2) she was terminated; and

23  (3) the termination was the result of an investigation the County began soon after she made her

24  report.

25    If an employee establishes a prima facie case of retaliation, it is presumed the employer

26  retaliated.  *See id.*  A defendant may rebut that presumption by offering "a legitimate,

27  nonretaliatory reason for the adverse employment action."  *Id.*  The County cited legitimate

28  reasons to terminate Goodson's employment at trial: Goodson had an inappropriately close

1   relationship with Hymas; she violated safety policies by taking Hymas out of the secure area in

2   the jail for long periods, sometimes without all of her equipment on; and she attempted to hide

3   her late-night off-duty phone conservations with Hymas from her supervisors and investigators.

4   The County also provided a legitimate, nonretaliatory explanation for the timing of its

5   investigation by citing the inmate complaint from Norberg.

6         Because the County offered a legitimate reason for its decision, "the burden shifts back to

7   the employee to prove intentional retaliation." *Id.* The question is not whether "the employer's

8   decision was wrong, mistaken, or unwise." *Jumaane v. City of Los Angeles*, 241 Cal. App. 4th

9   1390, 1409 (2015) (quoting *McRae v. Dep't of Corr.. & Rehab.*, 142 Cal. App. 4th 377, 388

10   (2006)). It is whether the evidence "as a whole" shows the employer exhibited a "retaliatory

11   animus." *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 715 (2008). The employee

12   can prevail by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or

13   contradictions in the employer's proffered legitimate reasons for its action" deprive the

14   employer's explanation of credibility. *Jumaane*, 241 Cal. App. 4th at 1409 (quoting *McRae*,

15   142 Cal. App. 4th at 389). A plaintiff may prevail without excluding all other potential

16   motivations for the employer's actions. *See, e.g.*, *Khoiny v. Dignity Health*, 76 Cal. App. 5th 390,

17   409 (2022), *reh'g denied* (Apr. 6, 2022), *review denied* (June 22, 2022). That is, an employer is

18   liable for retaliation if retaliation was one "substantial motivating factor" behind its decision,

19   among others. *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 232 (2013). Both direct and

20   circumstantial evidence can show the employer was motivated by retaliation. *Colarossi v. Coty*

21   *US Inc.*, 97 Cal. App. 4th 1142, 1153 (2002).

22         Goodson proved at trial that a retaliatory motive was a substantial motivating factor

23   behind her termination, even if not the only factor. Several categories of evidence support this

24   conclusion.

25         First, the internal investigation into Goodson's own behavior began almost immediately

26   after she made her sexual harassment report. Officers and sergeants in the jail had known

27   Goodson was spending time with Hymas for weeks, even months, before Norberg complained.

28   They did not look into the relationship more closely, and they did not go to the jail commander or

1  another more senior official.  Sergeants Adams and Compton waved away concerns about her

2  relationship with Hymas, and Sergeant Gott did not mention anything to her superiors when she

3  saw Goodson acting casually around Hymas during Hymas's trial.  Only after Goodson

4  complained, when it was rumored Compton would lose his job as a result, did officers in the jail,

5  including Gott and Tanner Hermann, move quickly and decisively.  They pressured Norberg to

6  repeat and write down his allegations of flirting and kissing and said nothing of his equivocations.

7  They accepted his claims without investigating his motivations or his own credibility.  They did

8  not ask other inmates what they had seen and did not look for corroboration before going directly

9  to the jail commander.  And soon after Norberg made shifting claims of flirting and kissing, he

10  was released—earlier than Officer Ah Wah had said he would be, earlier even than he had

11  expected.  In short, Goodson showed at trial that Norberg's complaint more likely provided a

12  convenient excuse or opportunity than a precipitating event.

13      Second, after Goodson was put on leave, and after she filed this lawsuit, the County's

14  investigator wrote a report to officials in the county where the state prison where Hymas was

15  confined was located, recommending criminal charges against Goodson.  These charges were

16  very weak.  When a prosecutor from outside the County looked into them, he dismissed them

17  voluntarily and informed the state court Goodson's conduct most likely was not criminal.  Even if

18  what she had done was technically a violation, the prosecutor thought the charge was so "de

19  minimis" that pursuing it would backfire with a jury.

20      Third, the County relied on Clark's and Canalia's dubious, one-sided, and even false

21  accusations against Goodson to justify its decision to terminate her employment.  It turned her

22  sexual harassment report against her.  It punished her for sexual harassment, but not Compton,

23  who had admitted to grabbing her breasts in a storage closet.  It punished her, but not the other

24  officers who had played the violent and often sexually charged games the County so often pointed

25  to at trial.  The County faulted Goodson for missing jail checks, but not the many other officers

26  who had missed jail checks.  The County charged Goodson with falsifying jail records, but it did

27  not prove that claim with evidence at trial.  It concluded incorrectly that Goodson had attempted

28  to use her status as a correctional officer to benefit Hymas and that she had discriminated on the

34

1   basis of race.  It charged her with disparaging County officials based on her simple failure to

2   disagree with Hymas's private criticisms of his prosecution..  Finally, it relied on speculative

3   inferences from thin circumstantial evidence to conclude Goodson had engaged in sexual conduct

4   with Hymas in the jail.  The County did not prove that highly charged claim at trial.

5          Fourth, Goodson offered unrebutted expert opinion by Oppenheimer that the County's

6   investigation fell short of accepted industry standards.  *See generally* Oppenheimer Report, Pl.

7   Ex. 49.  In Oppenheimer's assessment, the County terminated its investigation of Goodson's

8   sexual harassment claim prematurely, wrongly failed to refer the matter to a human resources

9   investigation, did not protect against retaliation, and treated Goodson as a suspect rather than as a

10  witness.

11         Finally, Canalia's notice of his recommendation to terminate Goodson's employment,

12  which he wrote on the County's behalf and which the County adopted, was retaliatory on its face.

13  He used insulting, caustic and hyperbolic language to describe Goodson's actions.  He did not

14  check Sergeant Clark's conclusions or recognize any errors or weak conclusions in his work, but

15  instead exaggerated the evidence and Clark's findings.  He directly linked his recommendation to

16  Compton's resignation, which he bemoaned.

17         For these reasons, the court concludes retaliation was a substantial motivating factor

18  behind the County's decision to investigate and discipline Goodson.  The County was

19  substantially motivated by the belief that Goodson had betrayed the Sheriff's Office and the

20  public by asserting her rights to a workplace free of harassment.  As a result, the County is liable

21  for retaliation under California Government Code section 12940(h).

22         The County cannot avoid liability by proving it would have fired Goodson regardless of

23  her sexual harassment complaint.  Even if an employer "proves it would have made the same

24  decision absent such discrimination, . . . the employer does not escape liability."  *Harris*,

25  56 Cal. 4th at 211 (2013).  "Consequently, when the plaintiff proves by a preponderance of the

26  evidence that discrimination was a substantial motivating factor in the adverse employment

27  decision, the employer is liable under the [Fair Employment and Housing Act]."  *Alamo v. Prac.*

28  *Mgmt. Info. Corp.*, 219 Cal. App. 4th 466, 481 (2013).

Although Goodson has established her retaliation claim under state law, she has not established her retaliation claim under federal law.  Like California Law, federal law makes it an "unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice . . . ." 42 U.S.C. § 2000e-3(a).  Federal courts also use the three-step burden-shifting scheme described above in discussing the state retaliation claim.  *See, e.g.*, *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065–66 (9th Cir. 2003); *see also Poland v. Chertoff*, 494 F.3d 1174, 1179–80 (9th Cir. 2007) (listing elements of prima facie case for retaliation).  For the most part, the evidence and reasoning above support Goodson's federal retaliation claim as well as her state retaliation claim: she opposed unlawful sexual harassment by reporting Compton's actions to the jail commander and by filing this lawsuit; she was soon placed on leave and eventually terminated; and the County's claim that it acted solely for non-retaliatory reasons is not credible.

But federal and California law differ in what they require of plaintiffs in cases of alleged retaliation.  Under California law, a plaintiff need only show the protected activity was a "substantial motivating factor" behind the employer's decision, *Harris*, 56 Cal. 4th at 232 (emphasis omitted), whereas under Title VII, a plaintiff must establish the protected activity "was a but-for cause of the alleged adverse action," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *see also Kell v. AutoZone, Inc.*, No. C064839, 2014 WL 509143, at *16 (Cal. Ct. App. Feb. 10, 2014), *as modified* (Feb. 24, 2014) (unpublished[2]) (discussing this difference).  For this reason, when an employer proves it relied on other independently sufficient reasons for terminating an employee, as the County did in this case, the employee cannot prevail in a federal claim under Title VII by casting doubt on only one of its reasons.  *See Curley v. City of N. Las Vegas*, 772 F.3d 629, 633 (9th Cir. 2014).  The employee must undermine all of the employer's explanations, for example by showing one of the employer's explanations was "so fishy and

---

[2] "Even though unpublished California Courts of Appeal decisions have no precedential value under California law, [federal courts are] 'not precluded' from considering such decisions 'as a possible reflection of California law.'"  *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1167 n.6 (9th Cir. 2011) (quoting *Emp'rs Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003)).

suspicious" that the others lack credibility as well. *See id.* at 633 n.3 (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005) (per curiam)).

Goodson proved at trial that her harassment complaint was a substantial motivating factor behind the County's decision to terminate her employment, but she did not show her complaint was a "but-for cause" of the County's decision. While it is a close call, the evidence fell short in two ways.

First, it remained unclear how the other officers would have responded to Norberg's allegations if Goodson had not reported Compton the week before. On the one hand, before her harassment complaint, other officers and supervising sergeants had known for several weeks, if not months, that Goodson was spending time with Hymas during her shift, but they did not report concerns or discipline her. If Goodson had not complained of harassment, officers might have done nothing in response to Norberg's complaint, as they had before when they had learned about her relationship with Hymas. But on the other hand, there is no evidence that anyone before Norberg had accused Goodson of flirting with or kissing Hymas, and the record shows Norberg made his complaint on his own, initially, before pressure from Gott to record it in writing. What Norberg wrote does not contradict Gott's summary of what he said. Norberg's allegations could have raised more serious concerns among Goodson's supervising sergeants even if she had not made a complaint against Compton. If Goodson's supervisors had then looked into Norberg's allegations, they might have discovered the full extent of her relationship with Hymas, and they might have gone to Commander Hermann just the same.

Second, even if officers had looked more closely into Norberg's allegations, even if they had discovered Goodson was speaking to Hymas on the phone while she was off duty, and even if they had learned Goodson had developed an intimate relationship with Hymas after his release, the evidence does not show what sanction the County would most likely have imposed. On the one hand, some evidence suggests a sanction less than termination was possible. Compton, for example, had a sexual relationship with a former inmate but received only a written reprimand for "fraternization." *See* Compton Dep. 18–19, 71–74, ECF No. 124; Trial Tr. 658, 824, 853. But on the other hand, Commander Hermann testified credibly and without contradiction at trial that

1   termination is the automatic sanction if an officer is dishonest with investigators or has sexual

2   conversations with inmates, as Goodson was and did.  Trial Tr. 825.  This latter evidence stands

3   in the way of her effort to show she would most likely have kept her job if she had not reported

4   sexual harassment.

5         This is not to say the County was exonerated at trial.  The County was not required to

6   prove affirmatively it would have terminated Goodson's employment even if she had not

7   complained of harassment, and it did not.  But the evidence does not persuasively show any one

8   particular outcome was most likely: Goodson did not prove she would most likely have kept her

9   job if she had not reported Compton; the County did not prove it would have fired her if she had

10   not reported Compton.  On this record, any definitive finding about what would most likely have

11   happened would amount to speculation.  Because the law places the burden on Goodson to prove

12   her report was a but-for cause of her termination, she did not prevail on her federal retaliation

13   claim.

14         In sum, the County is liable for retaliating against Goodson in violation of the California

15   Fair Employment and Housing Act, but she has not shown the County is liable for retaliation

16   under Title VII.

17      **C.**    **Remedies**

18         Given the court has found the County liable in part under the Fair Employment and

19   Housing Act, it must next determine what remedies are appropriate.  "[I]n a civil action under the

20   [Fair Employment and Housing Act], all relief generally available in noncontractual actions,

21   including punitive damages, may be obtained."  *Commodore Home Sys., Inc. v. Superior Ct.*,

22   32 Cal. 3d 211, 221 (1982).  Courts may award declaratory judgment, injunctive relief, and

23   reasonable attorneys' fees and costs in appropriate cases.  *See Harris*, 56 Cal. 4th at 234–35.  The

24   court begins with Goodson's request for compensatory damages.

25         At the outset, "a plaintiff's own conduct may limit the amount of damages recoverable or

26   bar recovery entirely."  *Health Servs.*, 31 Cal. 4th at 1042 (citations omitted).  The right to

27   recover damages in a sexual harassment action, as in any civil action, is "qualified by the

28   common law doctrine of avoidable consequences."  *Id.*  Under this doctrine, "a person injured by

1   another's wrongful conduct will not be compensated for damages that the injured person could

2   have avoided by reasonable effort or expenditure." *Id.* at 1043.  In harassment cases under the

3   Fair Employment and Housing Act, an affirmative defense based on avoidable consequences has

4   three elements: "(1) the employer took reasonable steps to prevent and correct workplace sexual

5   harassment; (2) the employee unreasonably failed to use the preventive and corrective measures

6   that the employer provided; and (3) reasonable use of the employer's procedures would have

7   prevented at least some of the harm that the employee suffered." *Id.* at 1044.  "The

8   reasonableness of the injured party's efforts must be judged in light of the situation existing at the

9   time and not with the benefit of hindsight." *Id.* at 1043–44.  "The defendant bears the burden of

10  pleading and proving a defense based on the avoidable consequences doctrine." *Id.* at 1044.

11          The County argues Goodson could have avoided further harassment if she had

12  immediately reported Compton when the sexual harassment began.  Goodson hesitated to report

13  what Compton had done because she feared retaliation, and she feared if she came forward, she

14  would be forfeiting her job and her career in law enforcement.  She believed another female

15  officer who had reported harassment before had been fired or forced out of the job and a career in

16  law enforcement as a result. *See, e.g.*, Trial Tr. at 67.  The County did not present evidence to

17  show Goodson's belief was unfounded or unreasonable.  Nor did it show it did anything to

18  reassure Goodson or any other employee they would not face any negative consequences for

19  reporting harassment.  Goodson's fears of retribution were in fact reasonable.  When she reported

20  Compton, she faced retaliation.  As explained above, Goodson proved at trial the County's

21  decision to terminate her employment was motivated in part by its employees' indignation that

22  she had asserted her rights to a workplace free of sexual harassment despite her relationship with

23  Hymas.  The County did not show Goodson was unreasonable in delaying her report of

24  harassment.

25          The court concludes similarly that the County has not established a defense against a

26  damages award under the California Supreme Court's decision in *Harris*.  *See* 56 Cal. 4th at 211

27  (prohibiting an award of "damages, backpay, or an order of reinstatement" if "the employer

28  proves it would have made the same decision").  As explained in the previous section, the County

39

did not show it would have made the same decisions if Goodson had never reported harassment under state law.

Moving, then, to the amount of an appropriate compensatory damages award, the court begins with compensation for pain and suffering. "One of the most difficult tasks imposed on a fact finder is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering." *Pearl v. City of Los Angeles*, 36 Cal. App. 5th 475, 491 (2019) (citation omitted). Federal district courts often have considered jury verdicts in roughly comparable cases when settling on an appropriate award of pain and suffering damages. *See, e.g.*, *Estevez v. United States*, 72 F. Supp. 2d 205, 208–11 (S.D.N.Y. 1999). This court will do the same, relying on the following findings to identify appropriate comparators:

- Compton made several sexually harassing comments, assaulted Goodson physically, and used force to restrain her.
- Compton was one of Goodson's supervisors, and he threatened her with retaliation if she reported him.
- The County was motivated in substantial part by retaliation. That said, Goodson did not prove her harassment claim was a but-for cause of the investigation or termination. Nor did the County prove it would have terminated her employment regardless of her harassment claim.
- The County is a public entity, and Goodson's workplace was in a law enforcement environment.
- Goodson offered an unrebutted and credible opinion from an expert psychologist about her diagnosis of post-traumatic stress disorder and depressive disorder as a result of the harassment, the investigation, and her termination. These conditions were sufficiently severe to warrant counseling and prescription medications.
- Goodson testified without contradiction about her symptoms, which were severe, including the loss of her hair and detachment from her children and parents. Her pain and suffering have remained with her even though many years have passed.

1          • The harassment and investigation occurred at a time when Goodson was facing

2              financial difficulties and a contentious divorce, which may have contributed to the

3              severity of her symptoms.

4          Damages awards and settlements in recent and roughly similar California cases vary from

5   tens of thousands of dollars to more than one million dollars depending on the severity of the

6   harassment, the extent of the harm, related retaliation, and other considerations not easily

7   discerned from summary verdict and settlement records.[3]  Goodson proposes an award of $10

8   million, citing a 2012 jury verdict in a sexual harassment case tried in this court.  *See* Pl.'s

9   Proposed Findings at 9, ECF No. 158 (citing Verdict Form, *Chopourian v. Catholic Healthcare*

10  *W.*, No. 2:09-cv-2972 (E.D. Cal. Feb. 29, 2012), ECF No. 294[4]).  After reviewing prior cases, the

---

[3] *See, e.g.*, *Nix v. City of Los Angeles*, JVR No. 2301090020 (Cal. Sup. Ct. L.A. Cty. July 20, 2022) (compensatory damages of $1.3 million paid in settlement to female police officer alleging sexually hostile work environment and retaliation for complaints); *LaFoy v. County of San Diego*, 2021 Jury Verdict Alert LEXIS 25 (Cal. Sup. Ct. San Diego Cty. April 26, 2021) (compensatory damages of $60,000 to law enforcement officer whose former supervisor and friend hugged her and touched her buttocks, and who was diagnosed with depression, anxiety, and post-traumatic stress disorder); *Tsatryan v. City of Los Angeles*, JVR No. 2011200032 (Cal. Sup. Ct. L.A. Cty. June 9, 2020) (compensatory damages of $200,000 paid in settlement to law enforcement officer whose supervisor made degrading sexual comments and used painful holds, which others dismissed as "play fighting"); *Green v. City & County of San Francisco*, JVR No. 2005070007 (Super. Ct. S.F. Cty. Dec. 17, 2019) (compensatory award of $82,500 paid in settlement to deputy sheriff for sexual harassment and retaliation by supervisor based on claims of unwelcome sexual comments, hugs, and similar contact, as well as failure to accommodate and disability discrimination); *Fisher v. L.A. Cty. Dep't of Health Servs.*, No. BC703904, 1 Trials Digest 23 d 2 (Cal. Super. Ct. L.A. Cty. Nov. 20, 2019) (jury verdict awarding among other damages compensatory damages of $48,493 for sexual harassment by public employee supervisor and retaliation); *Sanchez v. Cal. Dep't Corr. & Rehab.*, JVR No. 1511240074 (E.D. Cal. 2015) (jury awarded compensatory damages of $550,000 and punitive damages of $15,000 to corrections officer subjected to sexual harassment, including unwelcome comments and touching, and retaliation, including discipline and intimidation); *Vandervoort v. Fontana Unified School District*, 2015 Jury Verdicts LEXIS 4749 (Cal. Sup. Ct. San Bernardino March 2, 2015) (compensatory damages of $1,487,000 for public employee forced to perform sexual acts and later diagnosed with post-traumatic stress disorder, anxiety, and depression).  The court takes judicial notice of these records.  *See, e.g.*, *Vasquez v. Arvato Digital Servs., LLC*, No. 11-02836, 2011 WL 2560261, at *2 (C.D. Cal. June 27, 2011) (taking judicial notice of publicly reported damages verdicts in similar cases).

[4] The *Chopourian* case ultimately settled after the court heard a motion for new trial or damages remittitur, before the court issued an order resolving the motion.  *See* Hr'g Mins., *Chopourian v. Catholic Healthcare W.*, No. 2:09-cv-2972 (E.D. Cal. Oct. 25, 2012), ECF No. 354; Not. of Settlement, ECF No. 358.

1    court finds a compensatory damages award of $500,000 will compensate Goodson for the pain

2    and suffering caused by the harassment and retaliation and align with compensatory damages

3    awards in similar, recent cases in California.  The harassment and retaliation in this case were less

4    severe than in cases where higher damages were awarded, *see, e.g.*, *Vandervoort*, 2015 Jury

5    Verdicts Lexis 4749; *Chopourian*, No. 2:09-cv-2972, ECF Nos. 294, 354, 358, and more severe

6    than in cases with lower awards, *see, e.g.*, *LaFoy*, 2021 Jury Verdict Alert LEXIS 25.

7         Compton and the County are jointly and severally liable for damages attributable to the

8    hostile work environment, but only the County is liable for damages attributable to the retaliatory

9    investigation and termination.  *See* J. Council of Cal. Civil Jury Instr. 2521A at 1553 (2022)

10   (citing *Bihun v. AT&T Infor. Sys., Inc.*, 13 Cal. App. 4th 976, 1000 (1993), *disapproved on other*

11   *grounds in Lakin v. Watkins Associated Industries*, 6 Cal. 4th 644, 664 (1993)).  The parties have

12   not addressed how to distinguish these categories of damages.  The court need not and does not

13   do so at this time.  *Cf. Harris*, 56 Cal. 4th at 233–34 (discussing potential division of

14   noneconomic damages when, unlike in this case, the employer proves it would have made the

15   same decision).  The court will direct the parties to meet and confer and submit proposals for

16   resolving this issue.

17        Goodson also is entitled to damages to compensate her for any salary and benefits she lost

18   as a result of the termination.  She offered the unrebutted and credible opinion of an economist,

19   Charles Mahla, who estimated her termination resulted in a loss of past earnings equal to $52,214.

20   Pl. Ex. 50 at 11.  The court will award that amount.  Mahla also estimated Goodson's future

21   pension benefits at the time of trial were worth almost $2 million.  *See id.*  Goodson did not

22   prove, however, she was likely to remain employed by the County throughout the remainder of

23   her career.  She was in fact considering alternatives in other agencies.  In addition, as noted

24   above, the parties offered conflicting and inconclusive evidence about the County's true

25   motivations, and it is unclear what disciplinary action the County would have taken against

26   Goodson, if any, had she not complained of harassment.  All estimates of future earnings are

27   uncertain, but the uncertainty about Goodson's future employment with the County in this case is

28   high.  Based on the evidence presented at trial, the court finds there was a small chance, on the

1    order of one in ten, that Goodson would have remained employed if she had not reported

2    harassment.  In light of that uncertainty, the court imposes a ninety-percent reduction on the

3    roughly $2 million in lost pension benefits, resulting in an award of $200,000.

4           Goodson also seeks punitive damages against Compton.  "In an action for the breach of an

5    obligation not arising from contract, where it is proven by clear and convincing evidence that the

6    defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual

7    damages, may recover damages for the sake of example and by way of punishing the defendant."

8    Cal. Civ. Code § 3294(a).  "'Malice' means conduct which is intended by the defendant to cause

9    injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful

10   and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1).

11   "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in

12   conscious disregard of that person's rights." Cal. Civ. Code § 3294(c)(2).  "'Fraud' means an

13   intentional misrepresentation, deceit, or concealment of a material fact known to the defendant

14   with the intention on the part of the defendant of thereby depriving a person of property or legal

15   rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3).

16          Although Goodson proved Compton is liable for sexual harassment by a preponderance of

17   the evidence, she did not prove to the standard of "clear and convincing evidence" that he acted

18   with malice, oppression, or fraud.  As summarized above, Compton denied a number of

19   Goodson's allegations, no other witnesses saw or heard the harassment and she offered no written

20   or other recorded evidence to corroborate her claims.  Compton also testified he was ashamed he

21   had not immediately told investigators more of the truth, citing his difficult family history. *See,*

22   *e.g.*, Trial Tr. at 636–39.

23          In addition to damages, Goodson's complaint requests attorneys' fees, costs, pre- and

24   post-judgment interest, "an order enjoining Defendants from engaging in further violations of the

25   Constitution and laws set forth above," and "such other relief as the court deems proper."  Second

26   Am. Compl. at 20–21.  The court concludes Goodson is entitled to equitable relief to reaffirm her

27   equal standing in the community, to condemn harassment and retaliation and to prevent future

28   harassment and retaliation.  An award of appropriate fees and costs and pre- and post-judgment

1    interest may also be appropriate.  The court reserves a decision on the exact form of this equitable

2    relief and on the amount of any fees, costs and interest until the parties have had an opportunity to

3    meet and confer, present their respective positions and make further argument, if necessary.

4    **IV.    CONCLUSION**

5           For the reasons above, Compton and the County are liable for sexual harassment in

6    violation of California Government Code section 12940(j)(1), and the County is liable for

7    retaliation in violation of Government Code section 12940(h).  Defendants are entitled to

8    judgment on all other remaining claims.

9           Goodson is awarded $500,000 for pain and suffering, $52,214 for past earnings lost, and

10   $200,000 for future earnings lost, in total $752,214.  The court awards no punitive damages.

11          The parties are directed to meet and confer and exhaust their efforts to reach an agreement

12   on appropriate forms of declaratory relief; injunctive relief; attorneys' fees and costs; and pre-

13   and post-judgment interest, if any.  The parties shall also meet and confer about the amount of

14   damages for which Compton and the County are jointly and severally liable.  **Within thirty days**,

15   the parties shall file a joint status report on their efforts to meet and confer and any agreements

16   they reach.  If disputes remain outstanding, the parties' joint report must propose a schedule for

17   briefing and a hearing, as necessary, to resolve those outstanding disputes.  The parties may also

18   request referral to the court's Voluntary Dispute Resolution Program or to a settlement

19   conference before another judge of this court.

20          IT IS SO ORDERED.

21   DATED:  July 20, 2023.

22

_____

CHIEF UNITED STATES DISTRICT JUDGE